IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| THOMAS SCOTT ANDERSON,<br><br>Plaintiff,<br><br>vs.<br><br>MIKE BATISTA, Director of the Montana Department of Corrections, LEROY KIRKEGARD, Warden of the Montana State Prison, and DR. KOHUT, individually and in their official capacities,[1]<br><br>Defendants. | CV 15-00031-H-DLC-JTJ<br><br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Plaintiff, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging a denial of medical care for his hepatitis C condition while he has been incarcerated at the Montana State Prison (MSP). Pending is Defendants' Motion for Summary Judgment. (Doc. 33.)

## I. STANDARD

A party is entitled to summary judgment if they can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). That is, where the

---

[1] The caption has been amended to reflect the dismissal of the Montana Department of Corrections. (Order dated August 7, 2015, Doc. 17.)

documentary evidence permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The non-moving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions. *Id*. Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment. *Id*.

At the summary judgment stage, the judge's function is not to weigh the evidence or determine the truth of the matter but to determine whether there is a genuine issue for trial. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249-50.

> The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson*, 477 U.S. at 252.

In the context of a motion for summary judgment where a litigant is proceeding pro se, the Court has an obligation to construe pro se documents liberally and to afford the pro se litigant the benefit of any doubt. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Baker v. McNeil Island Corrections Ctr.*, 859 F.2d 124, 127 (9th Cir. 1988).

## II.  FACTS

Mr. Anderson came to MSP in October 2014 with a recently diagnosed hepatitis C infection, which he reported having contracted through intravenous drug use.  The infection was diagnosed in fall 2103 by medical providers at Benefis Hospital in Great Falls during Mr. Anderson's incarceration at the Cascade County Detention Center.  (Statement of Undisputed Facts ("SUF"), Doc. 35 at ¶ 8, citing Kohut Declaration, Doc. 35-3 at ¶ 8.)  Medical records from Benefis Hospital were reviewed within one month of Mr. Anderson's arrival at MSP.  Those records include liver panels showing elevated liver enzymes consistent with

hepatitis or inflammation of the liver. On April 20, 2013, Mr. Anderson's "AST" level was 516 and his "ALT" enzyme—which is considered a more important marker of hepatitis C-caused liver inflammation—was 1654. Less than four months later, on August 7, 2013, Mr. Anderson's AST level had decreased to 211 and his ALT level had decreased to 531. Dr. Kohut testified that this significant decrease in AST and ALT levels is likely due to the circumstances of Mr. Anderson's incarceration, most importantly forced abstinence from alcohol and intravenous drug use. (SUF, Doc. 35 at ¶ 9, citing Kohut Declaration, Doc. 35-3 at ¶ 9.) Mr. Anderson insists that he did not use alcohol very often prior to his incarceration, fewer than four times a year. (Anderson's Response to Defendants' Statement of Undisputed Facts (SDF), Doc. 38 at ¶ 9.)

The medical records from Benefis, generated during Mr. Anderson's incarceration in Cascade County, indicated that Mr. Anderson was examined by Physician Assistant (PA) Scott in September 2013. According to the records, Mr. Anderson denied abdominal pain, gastrointestinal bleeding, or mental confusion. PA Scott noted that total bilirubin and alkaline phosphatase levels were normal. Mr. Anderson denied fatigue, fever, weight gain or loss, and night sweats. He was not jaundiced, displayed no abdominal tenderness or hepatic enlargement, and he did not have stigmata of chronic liver disease. (SUF, Doc. 35 at ¶ 10, citing Kohut

4

Declaration, Doc. 35-3 at ¶ 10.)

Mr. Anderson disputes this statement of his medical condition and states that he has had quite significant weight gain and loss (vacillating between 130 and 190 pounds). He constantly reported loss of sleep to Cascade County Jail and the MSP mental health staff. He contends that fatigue and night sweats have been an issue but he has been brushed off by medical staff. (SDF, Doc. 38 at ¶ 10.)

Mr. Anderson's liver was biopsied at Benefis by Dr. Ayers in September 2013. The pathology report states a diagnosis of hepatitis with periportal chronic inflammation and focal or rare piecemeal necrosis and lobular inflammation. The report states that there was "no fibrosis." (SUF, Doc. 35 at ¶ 11, citing Kohut Declaration, Doc. 35-3 at ¶ 11.)

In October 2014, when Mr. Anderson arrived at MSP, Mr. Anderson reported low back pain. His primary medical complaints during his time at MSP have been unrelated to hepatitis, including sciatic, neck and low back pain, as well as depression, anxiety, and rage. Mr. Anderson is 32 year olds. He has an asymptomatic chronic hepatitis C infection. He is otherwise in generally good medical condition and health. (SUF, Doc. 35 at ¶ 12, citing Kohut Declaration, Doc. 35-3 at ¶ 12.)

Mr. Anderson disputes this statement, stating that every time he met with

any provider he brought up issues with his hepatitis C and requested blood panels. Lance Griffin ordered blood tests. Dr. Kohut told him that he made the decisions on who to treat and Mr. Anderson would not get treatment. He contends that he has not been able to convey his hepatitis C concerns to Dr. Kohut due to Dr. Kohut's "stonewalling." (SDF, Doc. 38 at ¶ 12.)

Within two months of Mr. Anderson's arrival at MSP, additional liver function tests were ordered. On December 17, 2014, Mr. Anderson's AST level had decreased to 159 and his ALT level had decreased to 350. (SUF, Doc. 35 at ¶ 13, citing Kohut Declaration, Doc. 35-3 at ¶ 13.)

Dr. Kohut saw Mr. Anderson on January 6, 2015. He noted that Mr. Anderson had a recent hepatitis C diagnosis and that a September 2013 biopsy showed no fibrosis. Dr. Kohut discussed this with Mr. Anderson and informed him that if liver function tests increased he would consider ordering further testing to determine progression. (SUF, Doc. 35 at ¶ 14 citing Kohut Declaration, Doc. 35-3 at ¶ 14.)

Mr. Anderson disputes this statement. He contends that this meeting took place in a completely unprofessional manner. He alleges he was denied any type of treatment, without a reason and in such a nasty manner. He contends Dr. Kohut blew up when he tried to ask questions about why he could not be treated. (SDF,

Doc. 38 at ¶ 14.)

In May 2015, PA Griffin ordered another liver panel, which showed that Mr. Anderson's AST level had decreased to 84 and his ALT level had decreased to 190. Another liver panel was done in November 2015. At that time, Mr. Anderson's AST level decreased to 74 but his ALT level increased to 210. These liver enzymes, in particular the ALT levels, are in Dr. Kohut's opinion attributable to the fact that Mr. Anderson has not been abusing substances toxic to the liver. (SUF, Doc. 35 at ¶ 15, citing Kohut Declaration, Doc. 35-3 at ¶ 15.) Mr. Anderson contends that the two tests in this statement actually increased which is attributed to the fact that these levels fluxuate. He argues that intravenous drug use has not been a factor in a long time. (SDF, Doc. 38 at ¶ 15.)

Managing hepatitis-C infected patients in the prison context necessitates guidelines for the management and treatment of this patient population. Patients who test positive for the hepatitis C Antibody are enrolled in the "Hep C database" and offered Hep A/B prophylaxis. Their ALT levels are measured at six-month intervals. If the ALT level exceeds more than two times the normal upper limit (11-79 U/L) on two consecutive blood draws, a viral load and genotype is ordered. Mr. Anderson's ALT levels met this standard. Thus, his genotype was obtained. Mr. Anderson's genotype is 1a. It is quite common, both in correctional and in the

7

community healthcare contexts, for a person in Mr. Anderson's ALT range, i.e., an ALT between two and three times the normal upper limit, to be monitored rather than given drug therapies. Mr. Anderson's viral load was 2,090,000 in December 2014 and 1,555,000 in June 2015. The average viral load is about 6,000,000. The viral load is obtained to ascertain whether a patient is considered chronically infected because a significant percentage of persons infected with the virus will clear the virus spontaneously. The viral load is not considered a reliable prognostic indicator or a measure of the extent of virus-caused liver disease. Viral load is used to determine whether drug treatment has eradicated the virus. (SUF, Doc. 35 at ¶ 18, citing Kohut Declaration, Doc. 35-3 at ¶ 18.)

Mr. Anderson disputes this statement. He argues that the standards cited by Dr. Kohut are outdated. He alleges new treatments are available and genotype 1a is now easy to treat with new medications that have been known to cure hepatitis altogether. He states that when Dr. Kohut refused his treatment his viral load was around 1,500,000, which is high. (SDF, Doc. 38 at ¶ 18.)

Dr. Kohut has significant experience managing and treating patients infected with the hepatitis C virus. He also consults with specialists in the field. While guidelines for management of the patient population are necessary and helpful due to high rates of infection and to prioritize those whose needs are the

greatest, in all cases the primary consideration is the patient's overall health and the health care provider's clinical assessment and judgment. (SUF, Doc. 35 at ¶ 19, citing Kohut Declaration, Doc. 35-3 at ¶ 19.) Mr. Anderson contends that he does not feel that his overall health has been treated. (SDF, Doc. 38 at ¶ 19.)

Because Mr. Anderson's ALT levels have been more than twice the normal upper limit (11-79 U/L) in consecutive blood draws, Mr. Anderson's ALT level and overall condition have been and will continue to be monitored every six months. Estimates vary, but possibly 15-30% of individuals chronically infected with hepatitis C will go on to develop cirrhosis, and there is also a small risk of cancer in patients with cirrhosis. Mr. Anderson does not have cirrhosis. Although the vast majority of chronically-infected patients do not develop cirrhosis, if it does occur, it may take 10 to 20 years or more for cirrhosis to develop. In Dr. Kohut's opinion, in Mr. Anderson's case drug treatment is not required at this time. In Dr. Kohut's opinion, Mr. Anderson is not at significant risk of harm while he is being monitored. Dr. Kohut's medical judgment is based on a number of factors or considerations, such as, Mr. Anderson's general health status and clinical presentation, his ALT levels, the September 2013 biopsy report that revealed "no fibrosis," and the fact that Mr. Anderson's ALT levels have declined significantly during his relatively short time in prison. If Mr. Anderson's overall health

deteriorates, Dr. Kohut alleges he would order additional tests to determine progression and treat accordingly. (SUF, Doc. 35 at ¶ 20, citing Kohut Declaration, Doc. 35-3 at ¶ 20.)

Mr. Anderson disputes this statement. He contends that Dr. Kohut insists that if his hepatitis C deteriorated, then he would run additional tests. But Mr. Anderson contends that this is not treatment nor is it the best way to treat hepatitis. He argues that his ALT levels have not "declined significantly" but rather have simply "waxed and waned" as they tend to do in most hepatitis cases. (SDF, Doc. 38 at ¶ 20.)

Defendants admit that beginning in late 2013, the United States Food and Drug Administration started approving promising new drugs to treat hepatitis C, including genotype 1 infection, which until very recently had been very difficult to treat. These drugs include Olysio (approved November 2013), Solvaldi (approved December 2013), Harvoni (approved October 2014), and Viekira Pak (approved December 2014). These treatments are effective in clearing the virus, including in patients who have developed fibrosis and cirrhosis. The treatments can actually reverse fibrosis, provided the patient maintains a sober lifestyle. In Dr. Kohut's medical judgment, treatment with these drugs is not medically necessary at this time, independent of cost considerations. However, as a practical matter, even if

Mr. Anderson were in the community, he would confront substantial obstacles to obtaining these new treatments; Medicaid, private insurers, and the drug companies themselves have imposed eligibility criteria for these new treatments. As discussed above, Mr. Anderson's ALT levels have declined, his overall clinical health and presentation is good, and a recent biopsy revealed no fibrosis of his liver. These medications are generally not covered by public or private insurers under these circumstances. In addition, community healthcare providers would be required to address concerns about the risk of reinfection and amenability to treatment. Mr. Anderson appears to have been infected through intravenous drug use and by use of contaminated equipment. He has not undergone or successfully completed chemical dependency treatment. (SUF, Doc. 35 at ¶ 21, citing Kohut Declaration, Doc. 35-3 at ¶ 21.)

Mr. Anderson disputes this statement. He contends that the new medications to treat hepatitis C work when used before a patient has developed fibrosis and cirrhosis. He contends that Dr. Kohut's statement that these drugs are not usually used in prison settings or even easily obtained in the community is false. He argues that Washington state prison and the federal prisons are currently using these new medications to treat patients similar to him. He has been told that the Bureau of Prisons would even treat him because he is also a federal inmate serving

a federal sentence as well. He also contends that there is no way to tell exactly how he contracted hepatitis C and therefore to say how he contracted it would be a guess. He asked for chemical dependency treatment, but MSP denied his requests. (SDF, Doc. 38 at ¶ 21.)

After reviewing Mr. Anderson's file, Dr. Kohut opines that Mr. Anderson has received good care at MSP. He is not unconcerned about or ignoring his hepatitis C infection. Mr. Anderson is being monitored medically, and he will continue to be monitored regularly and appropriately according to his medical needs. (SUF, Doc. 35 at ¶ 22, citing Kohut Declaration, Doc. 35-3 at ¶ 22.)

Mr. Anderson disputes this statement. He contends that he should receive treatment. (SDF, Doc. 38 at ¶ 22.)

Director Batista and Warden Kirkegard are not medical experts, and they do not directly supervise Dr. Kohut or any other treatment providers at MSP. (SUF, Doc. 35 at ¶ 24, citing Batista Declaration, Doc. 35-1 at ¶ 4; Kirkegard Declaration, Doc. 35-2 at ¶ 4.) These Defendants deny that they were aware, prior to Mr. Anderson filing suit, that Mr. Anderson had been diagnosed with a hepatitis C infection. (SUF, Doc. 35 at ¶ 25, citing Kirkegard Declaration, Doc. 35-2 at ¶ 5; Batista Declaration, Doc. 35-1 at ¶ 5.) Mr. Anderson filed a grievance appeal to the Warden and the Director of the DOC on the matter of him not being treated,

and Director Batista and Warden Kirkegard answered the appeals. (SDF, Doc. 38 at ¶ 25.)

Neither Director Batista nor Warden Kirkegard have discussed Mr. Anderson's case with Dr. Kohut, and they have not been personally or directly involved in any decisions involving Mr. Anderson's care, treatment, or grievances. (SUF, Doc. 35 at ¶ 26, citing Kirkegard Declaration, Doc. 35-2 at ¶ 6; Batista Declaration, Doc. 35-1 at ¶ 5.) Mr. Anderson disputes this statement because, again, he contends he filed grievance appeals on this issue that Director Batista and Warden Kirkegard addressed. (SDF, Doc. 38 at ¶ 26.)

Director Batista and Warden Kirkegard have confidence in the medical team at MSP, including in particular Dr. Kohut. Neither have any reason to believe that Mr. Anderson's is not being cared for appropriately, or that he is being ignored or treated with deliberate indifference. Rather, their understanding is that Mr. Anderson's infection is being monitored by Dr. Kohut. (SUF, Doc. 35 at ¶ 27, citing Batista Declaration, Doc. 35-1 at ¶ 5; Kirkegard Declaration, Doc. 35-2 ¶ 7.)

Mr. Anderson admits that his condition is being monitored, but he claims that monitoring is not treatment. He testified: "I'm not being given medication, you know, and that's what I want." (SUF, Doc. 35 at ¶ 28, citing Anderson Deposition, Doc. 35-4 at 8:25-9:1, 11, 28, 43:24, 72.)

Mr. Anderson also concedes that he has gotten better since he has been incarcerated: "Yeah, my liver function is better than it was while I was free. That is the truth." He attributes his improvement to the way he is living. But he contends that better liver function does not mean hisiseing better, that would only be true if it was in remission or cured. He contends hepatitis is a progressive illness that does not get better without treatment. (SUF, Doc. 35 at ¶ 29, citing Anderson Depo., Doc. 35-4 at 10:6-7, 10-11; 11:23-24; 19.)

Mr. Anderson, however, acknowledges and appreciates that his ALT level has gone down because he has not had access to intravenous drugs. He understands that the initial spike in his ALT level resulted from his use of intravenous drugs (methamphetamine, heroin and prescription drugs). (SUF, Doc. 35 at ¶ 30, citing Anderson Depo., Doc. 35-4 at 13-15, 44-45.)

Mr. Anderson contracted the hepatitis C virus as a result of IV drug use after he was released from prison in Virginia and prior to committing the instant offenses. He specifically recalls using a needle that had been used by a woman he knew to be infected with the virus. Although in his deposition Mr. Anderson states that this happened in February 2012, the record suggests that the inoculation occurred in February 2013 because Mr. Anderson claims that he only used intravenous drugs from November 2012 through February 2013. Mr. Anderson

testified that he did not get the virus from tattooing and that he tested negative for the virus numerous times over the years. (SUF, Doc. 35 at ¶ 32 citing Anderson Depo., Doc. 35-4 at 13, 58-59, 81, 21, 59-60.)

Defendants contend Mr. Anderson's infection is and has been asymptomatic. (SUF, Doc. 35 at ¶ 33, citing Kohut Declaration, ¶¶ 10-12.) Mr. Anderson contends he complained of symptoms at Cascade County Jail that were ignored because he was there for such a short period of time. (SDF, Doc. 38 at ¶ 33.)

Mr. Anderson is "pretty sure" he would get drug treatment if he were in the community. He has "heard" that he qualifies. He wants "better care." He contends that the standard of care or community standards, as reflected in medical journals, require that he receive treatment with pharmaceuticals. He testified that "there's so much going on in the field of hepatitis" and "[t]here's new policy, new ways to treat it[.]" According to Mr. Anderson, "I'm on the fringes of being treated per the community medical standards." (SUF, Doc. 35 at ¶ 35, citing Anderson Depo., at 39-40, 74-78, 36:9-10; 36:19; 74; 34:23-24.)

The basis for Mr. Anderson's complaint against Dr. Kohut is his belief that Dr. Kohut is not treating him. In his Complaint, he alleges that his viral load has "continued to climb" and that Dr. Kohut has been deliberately indifferent to his viral load. Complaint, Doc. ¶ 18.

## III. ANALYSIS

To state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To prevail, a plaintiff must show both that his medical needs were objectively serious, and that the defendants possessed a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *See, e.g., Wood v. Housewright*, 900 F.2d 1332, 133741 (9th Cir. 1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989); *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992),

*overruled on other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established a demanding standard for "deliberate indifference." Negligence is insufficient. *Farmer*, 511 U.S. at 835. Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.* However, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not [without more] amount to deliberate of indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds, Peralta*

*v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). To establish that the difference of opinion rises to the level of deliberate indifference, a prisoner must show that the defendant's chosen course of treatment was medically unacceptable and in conscious disregard of an excessive risk to plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

The controlling issue is whether Defendants were deliberately indifferent to Mr. Anderson's hepatitis C condition. Dr. Kohut has made a reasoned medical decision based on his review of Mr. Anderson's medical and physical history and lab test results. He decided that drug treatment for Mr. Anderson's hepatitis C is not necessary at this time. Mr. Anderson has not presented the Court with any evidence to the contrary. Mr. Anderson's response to Defendants' Motion for Summary Judgment is full of hearsay and conclusory statements.[2] Mr. Anderson cannot rely on statements he has heard or information he has heard. That is hearsay. Hearsay is inadmissible in response to a motion for summary judgment and would be inadmissible at trial. *See Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on

---

[2] Hearsay is defined as "a statement made by an out-of-court declarant when it is offered at trial to prove the truth of the matter asserted." *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015), *citing* Fed. R. Evid. 801(c), 802.

inadmissible hearsay rather than the affiant's personal knowledge). For example, Mr. Anderson makes a representation that Lance Griffin, a provider at MSP, told him on February 16, 2016 that pursuant to medical community guidelines, he qualified for treatment; however, he produced no affidavit or medical record to substantiate this statement. He also contends that doctors at Benefis, Shelby, MSP, and Cascade County Jail told him that he qualifies for treatment (Affidavit, Doc. 37-1 at ¶ 33) but submits no evidence to support these statements. While medications may be available to treat hepatitis C, Mr. Anderson has not presented any evidence to indicate that he is a viable candidate for these treatments. Mr. Anderson provided no competent evidence to satisfy his burden of showing that Defendants chose a medically unacceptable course of treatment in conscious disregard of any risk to his health.

Moreover, this is not a case where Defendants ignored Mr. Anderson's medical condition. Defendants are monitoring Mr. Anderson's hepatitis C with regular blood work. According to the undisputed facts, all of his liver tests have indicated improvement except for a slight increase of 190 to 210 in his ALT enzyme level between May and November 2015. Mr. Anderson's viral load has actually decreased. Moreover, viral load is not a diagnostic tool or an indicator of progression of liver damage. A viral load is obtained to determine whether the

virus cleared spontaneously or whether drug therapy is working.  (SUF, Doc. 35 at ¶ 36, citing Anderson Depo., Doc. 35-4 at 11; Kohut Declaration, Doc. 35-3 at ¶ 18.)  Mr. Anderson's liver condition has not substantially changed since he has been at MSP, and Dr. Kohut testified that treatment was not medically advisable given his current condition.  Mr. Anderson disagrees with the medical assessment and wants treatment nonetheless.  Yet, he has no evidence to back up his contentions.  In short, Mr. Anderson failed to make the requisite showing to survive Defendants' motion for summary judgment.

Based upon the evidence before the Court, Defendants were not deliberately indifferent to Mr. Anderson's serious medical need in violation of his rights under the Eighth Amendment.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motion for Summary Judgment (Doc. 33) should be **GRANTED** and this matter **DISMISSED**.  The Clerk of Court should be directed to close the case and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

2.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate

Procedure that any appeal of this decision would not be taken in good faith. No reasonable person could suppose an appeal would have merit.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[3] 28 U.S.C. § 636. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed.R.App.P. 4(a) should not be filed until entry of the District Court's final judgment.

DATED this 15th day of August, 2016.


/s/ John Johnston
John Johnston
United States Magistrate Judge

---

[3] As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d). Therefore, three (3) days are added after the period would otherwise expire.